11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion


 

Mark
Minger 

Appellant 

Vs.                   Nos. 11-01-00107-CR, 11-01-00108-CR, 11-01-00109-CR, 11-01-00110-CR, &

11-01-00111-CR
B Appeals from Collin County

State of Texas 

Appellee

 

In one
trial involving five indictments, a jury convicted appellant of four counts of
aggravated kidnapping, and the jury also found that he committed three
violations of a protective order.  The
jury assessed punishment in three of the aggravated kidnapping convictions at
25 years confinement and at 20 years confinement for the other aggravated
kidnapping conviction.  The jury also
assessed 10 years confinement for each violation of the protective order.  We affirm. 

Appellant
brings two issues on appeal.  In his
first issue, appellant contends that the trial court erred when it admitted the
videotape of an interview with him which he claims was altered or enhanced. In
his second issue, appellant contends that the evidence is legally
insufficient  to support the jury=s verdict in the aggravated kidnapping
convictions.  There is no challenge to
the factual sufficiency of the evidence. 
We will discuss appellant=s second issue first.  

In order
to determine if the evidence is legally sufficient to support the verdict, we
must  review all the evidence in the
light most favorable to the verdict and determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S.
307 (1979); Johnson v. State, 23 S.W.3d 1 (Tex.Cr.App.2000).   The 
jury is the sole judge of the weight and credibility of the
evidence.  TEX. CODE CRIM. PRO. ANN.
arts. 36.13 & 38.04 (Vernon 1979 & 1981); Wesbrook v. State, 29 S.W.3d
103, 111 (Tex.Cr.App.2000), cert. den=d, 532 U.S. 944 (2001). 








A person
commits the offense of aggravated kidnapping if he intentionally or knowingly
abducts another person and uses or displays a deadly weapon during the
commission of the offense.  TEX. PENAL CODE
ANN. ' 20.04(b) (Vernon Supp. 2003).  TEX. PENAL CODE ANN. ' 20.01(2) (Vernon Supp. 2003) provides
that:  

AAbduct@ means to restrain a person with intent to
prevent his liberation by:  (A)
secreting or holding him in a place where he is not likely to be found; or (B)
using or threatening to use deadly force.

 

TEX.
PENAL CODE ANN. ' 20.01(1) (Vernon Supp. 2003) states that:

ARestrain@ means to restrict a person=s movements without consent, so as to
interfere substantially with the person=s liberty, by moving the person from one place to another or by
confining the person.

 

Whether substantial
interference has occurred is a question for the finder of fact.  Hines v. State, 75 S.W.3d 444, 448
(Tex.Cr.App.2002). 

The
evidence introduced at trial shows that appellant and his wife, Tammy Ramsey,
separated in July 1999.  Tammy obtained
a protective order against appellant in March 2000.   Included in the protective order were appellant=s son, M.M., as well as Tammy=s daughter, B.S., who had lived with Tammy
and appellant since B.S. was two years old.

Scott
Luesse testified that appellant worked for his father.  He further testified that appellant said
that he was going to take Tammy, B.S., and M.M.; that he was going to make
Tammy kill B.S. and M.M.; and that afterward 
he was going to kill Tammy and himself. 
Luesse and his father called the police.  The police placed appellant in protective custody and transported
him to Plano Medical Center. 

Sheila Ann
Walker testified that she had known appellant for about five or six years.  She further testified that appellant told
her in March or April of 2000 that he was going to kill himself and his
family.  Walker testified that appellant
told her that, A[w]hen someone walked the dog, he was going
to go up after them and, you know, kill himself and his family.@  She
also testified that appellant told her that:

He was going to hide in [Tammy=s] car 
in the trunk.  When he got her,
he was going to take her off, and he was going to rape her and hurt her, and he
was going to come back and finish the job with the rest of his family.








Bruce
Alfred Douglas testified that appellant lived with him about three weeks prior
to this  offense.  Douglas further testified that appellant
told him of his plans to Aforce [Tammy] in the car and drive her someplace, and she was going to
die, and it was going to take three days. 
It was going to be a slow death.@  Douglas also testified that he
and appellant would drive past the place where Tammy lived with her parents.  Douglas testified that appellant had
redeemed a gun appellant had pawned and that Douglas had put it in his safe
until appellant moved.  When appellant
moved out about a week before he was arrested, Douglas gave appellant the
gun.  

The State alleged that appellant committed the offenses on April 20,
2000.  At that time, Tammy and her two
children lived with Tammy=s parents in a garage apartment above a self-storage facility.  Tammy=s mother, Pamela Ramsey, testified that on April 20, 2000, before 7:00
a.m., as she was walking her dog, appellant jumped  from behind some bushes in front of Tammy=s car and pointed a gun at her.  Appellant told Pamela to go inside and A[b]e easy.@  Once they were inside the
apartment, appellant told Pamela to tell Tammy to come out.  Pamela told Tammy to come out.  As Tammy came out of the bathroom, B.S. and
M.M. came out of their bedroom at that time. 
Pamela testified that appellant pointed the gun at all of them as he
cocked and uncocked it several times. 
Pamela also testified that, when Tammy told appellant that it was over
and that she did not love him anymore: 

[H]e comes flying up out
of the chair, cocked the gun right in her face and started screaming, AIt=s over?  You=re telling me its over?@ I thought he was going to shoot her right
then.  

 

Pamela
further testified that appellant was trying to get B.S., M.M., and Tammy into
the car with him.  Pamela got the gun
away from appellant, attempted to get the bullets out of the gun, and told him
to leave her house.  Appellant wrestled
the gun away from Pamela and knocked her down. Pamela talked appellant into
giving her the gun; she was able to get the bullets out, and she called
911.  However, she hung up before anyone
answered because she was afraid that appellant knew that she was calling the
police.  The 911 operator called back,
and Pamela told her to send the police because someone was threatening her
family with a gun.  Pamela went down the
stairs to meet the police.  After he had
given the gun to Pamela, appellant grabbed Tammy, B.S., and M.M. and held them
tightly around the neck.  








B.S.
testified that, as she was getting dressed for school the morning of the
offense, she heard her mother and grandmother screaming at someone.  Appellant told B.S. and M.M. to come out of
their room and not to move.  B.S.
testified that appellant pointed the gun at Tammy one time.  She also testified that, after Pamela had
taken the gun from appellant, appellant grabbed her mother, her brother, and
herself in a hug on the floor.  Tammy
and appellant were sitting on the floor. 
M.M. was sitting beside them, and B.S. was standing behind them.  B.S. testified that she thought that M.M.
was scared and that her mind had gone blank.

Tammy
testified that, when Pamela called her out of the bathroom, she saw appellant
with the gun.  Tammy further testified
that, when she told him that she did not love him anymore, appellant pointed
the gun at her face.  After Pamela got
the gun from him the second time, appellant pulled Tammy down on the floor with
him.  Appellant held her around the
neck, and she could not get up or move. 
Tammy also testified that appellant had B.S. and M.M. in his grip as
well. 

 Officer William Gardner Rollins with the City
of Plano testified, that when he entered the room, B.S. and M.M. were standing
to the left and that appellant was not holding them.  He further testified that appellant was holding Tammy by the
arms.  Officer Rollins had to physically
separate them.  Officer Pat Clark and
Officer Bruce Yeager secured the gun, the bullets, and the rest of the
scene.  Officer Yeager testified that,
when he arrived, appellant and Tammy were sitting close together on the floor
and that Tammy had her arm on appellant=s shoulder.  He could not see
whether appellant was holding Tammy. 
Officer Clark  testified that he
did not see appellant holding Tammy; he only saw that they were sitting close
together on the floor and that B.S. and M.M. were away from appellant.  The officers arrested appellant.  

Officer
Cathy Stamm, an investigator from the family violence unit from Dallas,
testified that she searched appellant=s vehicle.  A pair of handcuffs,
one .357 round of ammunition, and several handmade poster board signs which
contained written pleas from appellant to Tammy asking her to let him return to
her and work out their problems were found. 


The evidence
is legally sufficient for the jury to find beyond a reasonable doubt that
appellant committed aggravated kidnapping. 
Appellant=s second issue on appeal is overruled. 








Appellant=s first issue is that a videotaped interview
of appellant was inadmissible because it was altered.  The afternoon after appellant was arrested, Officer Stamm
videotaped an interview with appellant. 
Officer Stamm testified that she gave appellant the appropriate warnings
on the videotape, that the interview was 30 to 45 minutes long, that the tape
recorder was self-automated, and that she put the tape in the recorder and
pressed record.  However, the interview
was recorded at the wrong speed.  

Using
various procedures, the State enhanced the recording by slowing it down,
filtering out background noise, and restoring treble tones lost in the process
of enhancement.  The persons involved in
the enhancement process testified about the process, and their testimony showed
that the process did not alter the original contents of the taped
interview.  Officer Stamm also testified
that the enhanced version of the videotape contained an accurate account of the
original interview. 

A trial
court=s ruling on the admissibility of evidence is
reviewed under an abuse-of-discretion standard.  Guzman v. State, 955 S.W.2d 85, 89 (Tex.Cr.App.1997).  The Texas Code of Criminal Procedure
provides specific rules for governing the oral statements of an accused.  TEX. CODE CRIM. PRO. ANN. art. 38.22, ' 3 (Vernon Pamph. Supp. 2003) provides in
relevant part:

(a) No
oral or sign language statement of an accused made as a result of custodial
interrogation shall be admissible against the accused in a criminal proceeding
unless:

 

(3) the
recording device was capable of making an accurate recording, the operator was
competent, and the recording is accurate and has not been altered. 

 








If the video accurately
reflects the actual interview, it is assumed that the operator was competent
and that the recording device was capable of making an accurate recording.  Falcetta v. State, 991 S.W.2d 295, 298
(Tex.App. B Texarkana 1999, pet=n ref=d).  A person with knowledge
need only testify that the video was an accurate portrayal of the interview and
had not been altered in order to meet the last two requirements of Article
38.22, section 3.  TEX.R.EVID.
901(b)(1); Angleton v. State, 971 S.W.2d 65 (Tex.Cr.App.1998).  Testimony of persons, who had knowledge of
the interview and who viewed the duplicate, that the video reflected the events
of the interview was sufficient to show the videotape=s authenticity.  Hall v. State, 67 S.W.3d 870 (Tex.Cr.App.2002).     Here,
Officer Stamm clearly had personal knowledge of the interview with appellant
because she is the one who conducted the interview.  She testified that the admitted videotape and the audio version
of the interview were accurate reflections of her interview with appellant. The
videotape meets the requirements of Article 38.22, section 3, and there was no
error.  Appellant=s first issue on appeal  is overruled. 

The
judgments of the trial court are affirmed. 

 

JIM
R. WRIGHT

JUSTICE

 

January 16, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of:  Arnot, C.J., and

Wright, J., and McCall, J.